UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EVELYN RAMOS,

Plaintiff,

v.

MARTIN O'MALLEY, Commissioner of Social Security,

Defendant.

No. 1:22-cv-01297-GSA

**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF EVELYN RAMOS AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 15, 18)**

## I. Introduction

Plaintiff Evelyn Ramos ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is before the Court on the parties' briefs.[1] Docs. 15, 18. After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.

## II. Factual and Procedural Background[2]

On October 25, 2018, Plaintiff applied for supplemental security income alleging a disability onset date of August 1, 2016. The Commissioner denied the application initially on December 7, 2018, and on reconsideration on February 20, 2019. Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on September 9, 2021. AR 37–56. On September 29, 2021 the ALJ issued an unfavorable decision. AR 15–36. The Appeals Council denied review on August 8, 2022. AR 1–8.

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 7 and 9.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, and thus will not be exhaustively summarized. Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

**III. <u>The Disability Standard</u>**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV. <u>The ALJ's Decision</u>**

At step one the ALJ found that Plaintiff did engage in substantial activity in the third and fourth quarters of 2020 working at Home Depot, but that there was also a continuous period of at least 12 months during which Plaintiff did not engage in substantial activity. The ALJ thus continued the five-step sequential analysis as to the periods during which Plaintiff did not engage in substantial gainful activity. AR 23.

At step two the ALJ found that Plaintiff had the severe impairment of bilateral hearing loss and the following non-severe impairments: diabetes mellitus, asthma, sinusitis, allergic rhinitis, umbilical hernia, cervicalgia, obesity, peripheral neuropathy, Covid-19 infection, and anxiety. AR 23–26. At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 26.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform a full range of work at all exertional levels but with no exposure to moderate levels of noise, concentrated levels of vibration, and must wear a hearing aid in her right ear. AR 26-29.

At step four the ALJ concluded that Plaintiff could not perform her past relevant work at

Home Depot (in an unspecified role) because it required exposure to moderate levels of noise. AR 29. At step five the ALJ concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform: mail sorter, surveillance system monitor, and charge account clerk. AR 30. Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her application date of October 25, 2018. AR 30.

## V. Issues Presented

Plaintiff asserts two claims of error: 1) that the ALJ failed to properly evaluate Plaintiff's dizziness and the impact it would have on her residual functional capacity; and 2) the ALJ failed to include work-related limitations in the residual functional capacity consistent with the nature and intensity of Plaintiff's limitations and additionally failed to offer any clear and convincing reasons for rejecting Plaintiff's subjective complaints. These two arguments are interrelated and will be addressed together.

### 1. Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10. Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

**2. <u>Analysis</u>**

Briefly by way of background, Plaintiff had a long history of inner ear dysfunction of unspecified origin which included: bilateral tympanic membrane perforation noted in 2016 (AR 347, 355); mild conductive hearing loss on the right and moderate to severe on the left (AR 372), presence of a perforation as of January 2018 (AR 442); otitis media acute suppurative with purulent drainage as of January 2019 (AR 544-45); reports of pain and pus discharge with headaches, dizziness, and tinnitus as of March 2019 (AR 542); reports of dizziness with head turning or position changes as of October 2019 (AR 521); otitis media with serous discharge noted in January 2020 (AR 514); otitis media with pussy discharge as of March 2020 (AR 504); left ear membrane perforation with yellow to greenish drainage in ear canal with erythematous, excessive skin dryness of

the right ear as of May 2020 (AR 567); large central perforation to the left ear, a very thin right tympanic membrane as of April and June 2021 (AR 573, 658).

Plaintiff underwent left tympanic membrane tympanoplasty surgery on August 18, 2021. AR. 662. At the one-week follow-up she reported vertigo and weakened taste. AR 659. Less than one month post operatively on September 9, 2021, Plaintiff reported light-headedness and balance issues. AR 654. Plaintiff's physician noted myofascial trigger points and referred Plaintiff to physical therapy. AR 654.

Plaintiff testified in pertinent part that she cannot work because: 1) of difficulty hearing in noisy environments even with her hearing aid because of loudness in her other hear, and 2) dizziness almost all day, including up to five spells where she must stop and sit down for a few minutes; that they interrupt her ability to complete household chores; and she experienced the same symptoms when working at Home Depot but did not miss work out of fear of losing her job. AR 47-49. Post-surgery, Plaintiff testified she still had trouble hearing in noisy environments due to loudness in her other ear. During the Administrative hearing the claimant had her device on speaker and up against her ear.

**a. <u>Hearing Loss</u>**

Although the ALJ did not differentiate between Plaintiff's hearing loss and dizziness, separating the two helps to clarify the issues. With respect to the hearing loss, the ALJ's decision is somewhat internally inconsistent. The ALJ found Plaintiff's testimony not entirely credible in part because "the claimant worked for several months at Home Depot in 2020, and this work was in a moderately noisy environment." AR 27. The ALJ nevertheless included in the RFC a *prohibition* on working in moderately noisy environments, thus finding at step four (in reliance on the VE's testimony) that an individual with such a prohibition would not be able to perform Plaintiff's past work at Home Depot.

The ALJ also emphasized that despite Plaintiff's impairment, Plaintiff was able to listen and testify during the telephonic hearing without issue. It is not clear just what the relevance of this was. First, Plaintiff did so by phone with her phone on speaker holding it up to her ear, and while in her car. AR 48. Further, as already discussed, the ALJ found Plaintiff could not work in moderately noisy environments. There is no dispute that Plaintiff had significant hearing difficulties as noted in repeated clinical findings as reflected in the results of the consultative audiological exam, and as the ALJ incorporated in the RFC. Further, Plaintiff's testimony (even if credited as true) does not speak to the existence of more significant hearing difficulties than incorporated in the RFC, nor does Plaintiff expressly contend otherwise. Plaintiff testified she could not work in noisy environments even with the hearing aid because the ambient noise caused loudness in her other ear. AR 48. Commensurate with that testimony, the RFC reflects Plaintiff cannot work in environments with even moderate ambient noise, which precluded her from doing her past relevant work as a customer service representative at Home Depot, but did not preclude other jobs in the national economy.

**b. Dizziness**

Again, the ALJ's discussion did not differentiate as to which alleged symptom or impairment was being evaluated. After acknowledging the relevant testimony summarized above, the ALJ explained as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because despite the alleged symptoms, the claimant worked for several months at Home Depot in 2020, and this work was in a moderately noisy environment. She admitted that she had similar symptoms while working and never told her employer about her condition. The record indicates that the claimant cares for her young children and manages her home. As discussed below, the record does indicate multiple ear infections during the period at issue, but there have not been hospitalizations related to the infections. In addition, the claimant is able to wear a hearing aid in the right ear, and was able to listen and testify during the telephonic hearing.

Regarding the work Plaintiff performed at Home Depot in 2020, to the extent the work

amounted to substantial gainful activity, this time period is already accounted for in the step one conclusion which precluded a disability finding as to the months Plaintiff worked at Home Depot. However, and importantly, the ALJ's analysis continued past step one. Specifically, there was a period of twelve consecutive months during the relevant period[4] during which Plaintiff indisputably *did not* engage in substantial gainful activity, yet the analysis continued to the RFC stage based on that distinct period.

If the job at Home Depot involved the performance of duties that contradict Plaintiff's alleged dizziness, the ALJ needed to make that finding expressly and explain why. The only connection the ALJ made between the work and the alleged symptoms was that the job was in a moderately noisy environment, which again is not a meaningful observation given there is no dispute that Plaintiff cannot work in such environments. This observation is thus not germane to Plaintiff's dizziness. Further, the performance of substantial gainful activity for an isolated period does not necessarily support broader inferences about Plaintiff's general functionality and non-disability throughout the relevant period. It is not implausible that someone could continue collecting a paycheck for an extended period of time while at the same time struggling to fulfill the duties of that job before ultimately leaving. Indeed, the doctrine of the "unsuccessful work attempt" as recognized in the regulations acknowledges that such an attempt could last up to six months and still not be considered substantial gainful activity if the claimant is forced to leave the job due to her impairment.[5] See, 20 C.F.R. §§404.1574(c), 416.974(c).

As to the ALJ's observation that "claimant cares for her young children and manages her home," these are non-specific activities which the ALJ provided no accompanying citation to the

[4] Plaintiff was unemployed during all but a few months of the nearly three-year relevant period between the application date of October 25, 2018 and the ALJ's decision date of September 29, 2021.

[5] Counsel argued in closing at the hearing that the time at Home Depot itself was an unsuccessful attempt (AR 55) (AR 259). Counsel however did not renew the argument on appeal.

record. Defendant similarly cited only the ALJ's opinion regarding these non-specific activities without citation to the record. As such, it is not clear where the ALJ got that information. The most pertinent testimony suggests Plaintiff did "help out" around the house, but did so with difficulty in between dizzy spells which required her to sit until the room stopped spinning. AR 49.

After finding the claimant's testimony was not entirely consistent with the record for the reasons identified, the ALJ provided an additional two pages of factual discussion, the sufficiency of which the parties dispute. The discussion reads as follows:

> The treatment record indicates a history of multiple ear infections since childhood (Exhibits 1F, p. 1; 4F, p. 2; 13F). The claimant has a left ear perforation of the tympanic membrane (Exhibit 4F, p. 6).
>
> Jagdev Singh, MD performed an audiologic examination in August 2017 (Exhibit 3F, pp. 3-6). The report indicates there was a 50 percent perforation of the left tympanic membrane and a normal right ear (Exhibit 3F, p. 3). Testing results indicated mild conductive hearing loss on the right and moderate to severe conductive hearing loss on the left with a perforated drum (Exhibit 3F, p. 3). The claimant had speech recognition at 55 decibels in the left ear and 35 decibels in the right ear (Exhibit 3F, p. 4).
>
> The claimant was seen by providers for follow up on her ears in January 2018, and she complained of her ears being plugged, but she denied any ear pain (Exhibit 6F, pp. 43, 44). She was diagnosed with nasal congestion at that time, in addition to bilateral hearing loss (Exhibit 6F, p. 44).
>
> In January 2019, the claimant presented to providers with complaints of pain in the right ear with purulent discharge for four to five days (Exhibit 9F, p. 47). She was prescribed ibuprofen, Augmentin, and Acetaminophen (Exhibit 9F, p. 48). Examination in March 2019 indicated pus in the left ear, and the infection was treated with antibiotics again (Exhibit 9F, pp. 8, 45). At a routine physical in August 2019, the claimant denied ringing in the ears, ear discharge, or earache (Exhibit 9F, p. 31).
>
> The claimant was treated for right otitis medial on October 1, 2019 (Exhibit 9F, p. 29). Providers followed up for the ear infection later in October 2019 and the claimant complained of feeling dizzy when turning her head or changing positions (Exhibit 9F, p. 24). She was wearing a hearing aid in the right ear, and she was prescribed meclizine for the vertigo (Exhibit 9F, pp. 25, 26). In January 2020 and May 2020, the claimant complained of left ear pain with discharge that were again treated with antibiotics and ibuprofen (Exhibit 9F, pp. 16, 17; 11F, pp. 3, 4).
>
> In April 2021, in a telephone visit the claimant reported left ear pain for five years and she requested a different ear nose and throat specialist (Exhibit 14F, p. 24). In June 2021, the claimant complained of tinnitus in the right ear, and exam indicated she still had a perforation to the left tympanic membrane (Exhibit 15F, p.

21). Left tympanoplasty was ordered to be scheduled at that time (Exhibit 15F, p. 21)

Providers performed left tympanoplasty on August 18, 2021 (Exhibit 15F, pp. 17, 25). At the one-week follow-up, the claimant reported vertigo the day before and weakened taste on the left side of her tongue (Exhibit 15F, p. 19). She was told the taste issue could be related to nerve involvement during the surgery, and she was told to wear an ear plug while showering (Exhibit 15F, p. 19). A month after the procedure, she reported feelings of lightheadedness and feeling off balance, but the provider noted she spent four hours a day looking down at her cell phone (Exhibit 15F, p. 17). She was referred for physical therapy for those complaints (Exhibit 15F, p. 10).

As for medical opinion(s) and prior administrative medical finding(s), I cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. I have fully considered the medical opinions and prior administrative medical findings as follows:

Ronald Wong, MD performed a consultative audiologic exam in April 2021 (Exhibit 12F, pp. 1- 2). The claimant reported that she normally wore a hearing aid in the right ear, but not in the left because of liquid coming out of the ear that made it uncomfortable (Exhibit 12F, p. 1). Exam indicated a large central perforation to the left ear, but there was no mucosa draining and the ear canal was dry (Exhibit 12F, p. 1). Audiometric studies indicated moderate sensorineural hearing loss in the right ear and mixed hearing loss in the left ear compatible with perforation with air bone gaps of about 30-35 dB (Exhibit 12F, p. 1). Dr. Wong recommended that the claimant continued to use a hearing aid in the right ear, but he noted she might have mixed results trying to use the hearing aid in the left ear with the perforation (Exhibit 12F, p. 1).

In relation to a prior application, the State agency medical consultants concluded that the claimant had no exertional, postural, or manipulative limits, but was limited in her hearing on the left and right, and she should avoid jobs that require normal binaural hearing and a noisy environment (Exhibit 1A). In relation to the current application, the State agency initially opined the claimant should avoid concentrated exposure to noise (Exhibit 3A). Upon the reconsideration, the State agency consultant opined that the claimant should avoid frequent or prolonged noise exposure due to hearing loss (Exhibit 5A).

I find the opinion of Dr. Wong and the State agency medical consultants to be consistent with and supported by the overall record. As discussed above, the claimant has had chronic ear problems since childhood and required surgery to close a perforation in her left eardrum. She has some hearing loss on the right side, but she is able to wear a hearing aide. I find that the overall record supports a limitation on exposure to even moderate levels of noise and she should avoid exposure to vibrations as well.

Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the overall evidence as discussed above.

AR 27–29.

Plaintiff contends that this discussion amounted to no more than a factual recitation with no

attempt to "bridge the analytical gap," whereas Defendant suggests that the ALJ's RFC was simply well grounded in the objective medical record. Even though the ALJ's RFC discussion was arguably rather short, the extent of the effort to bridge the gap between the factual summary and the conclusion was on par with the typical case.

Unlike physical examination findings in a typical case (e.g., normal strength, normal range, normal gait), the findings here underscored by Defendant and the ALJ do not suggest a high degree of physical functionality generally, nor do these findings undermine Plaintiff's complaints of dizziness specifically.

Defendant underscores: 1) the ALJ grounded the decision in Plaintiff's "relatively conservative treatment plan," which show that leading up to her surgery her ear infections were treated with ibuprofen and antibiotics and her hearing loss was treated with hearing aids (AR 505, 513-14, 545-46) (Resp. at 7, Doc. 18); 2) Plaintiff did not pursue tympanoplasty as early as 2016 when it was available to her; 3) while Plaintiff had 50% perforation on the left she had none on the right (AR 372-73); 4) although she ultimately had surgery to repair the perforation, no complications were noted (AR 662); 5) she denied ear pain to her providers in 2018 and 2019 (AR 442, 528); 6) Plaintiff's complaints of dizziness were isolated instances; 7) the ALJ's decision was supported by a host of medical opinions; 8) despite post-surgical complaints of dizziness, the provider noted she spent 4-hours per day looking down at her cell phone. The Court will address each argument sequentially.

**i. <u>Conservative Treatment</u>**

First, the ALJ never described the treatment plan as conservative, and to suggest Plaintiff had a relatively conservative treatment plan would not be a fair characterization based on the ALJ's factual summary set forth above. Plaintiff ultimately underwent surgery (tympanoplasty) to repair the left tympanic membrane. The fact that more conservative measures were exhausted prior to

surgery does not suggest an overall conservative treatment plan. Plaintiff followed up frequently for her ear infections, perforations, purulent discharge, and dizziness and was treated with antibiotics, ibuprofen, meclizine (for dizziness) and ultimately surgery. It's not clear what other measures Plaintiff ought to have exhausted that would better corroborate her alleged dizziness.

**ii. Delay Pursuing Surgery**

Second, it is not supportive of Defendant's argument when Defendant independently cites a record reflecting that tympanoplasty was available to Plaintiff as early as November of 2016 "if she desired." AR 347. This is because the relevant period did not begin until the application date of October 25, 2018, as SSI claims (unlike SSDI claims) are not retroactive to the disability onset date[6], thus in no event would SSI benefit backpay be available as early as November 2016 whether she underwent tympanoplasty at the time or not.

Further, the ALJ did not cite or describe the November 2016 office visit in question, did not otherwise note that tympanoplasty was proposed as early as November 2016, did not make an observation about the timing of the surgery, and finally did not otherwise suggest that Plaintiff's choice not to pursue the surgery earlier suggests her dizziness was not as severe as alleged. The point was Defendant's alone, not the ALJs.

Although the pertinent caselaw does not require ALJ decisions to be a "model of clarity" if the ALJ's logical "path can be reasonably discerned,"[7] however, it is generally not appropriate for the Commissioner to independently cite facts not referenced in the ALJ's decision, *and* then to independently articulate their significance. More appropriately, the Commissioner should be clear when making distinct points not discussed by the ALJ.[8]

---

[6] Generally, Title II [SSDI] benefits may be paid retroactively for up to 12 months prior to filing of an application. Payment of Title XVI [SSI] benefits, however, cannot precede the month following the month of application. 20 C.F.R. §§ 404.621, 416.335).

[7] *Wilson v. Berryhill*, 757 Fed. Appx. 595, 597 (9th Cir. 2019)

[8] Defendant's full quotation reads: "The ALJ also sufficiently discussed how the limited nature and scope of Plaintiff's treatment undermined her alleged inability to work. See C.F.R § 416 (c)(3)(iv). Although a surgical intervention was

**iii. Degree of Perforation**

Third, neither Defendant nor the ALJ explained why a 50% perforation on the left but no perforation on the right amounts to an unremarkable examination or undermines Plaintiff's alleged dizziness. Reciting two findings in succession, one malignant and one benign, is not helpful.

**iv. Lack of Post-Surgical Complications**

Fourth, Defendant's emphasis on the lack of post-surgical complications is again not helpful as it does not necessarily reflect the effectiveness of the procedure in general, or does it address reduction in dizziness specifically.

**v. Denial of Ear Pain**

Fifth, Defendant and the ALJ emphasized that Plaintiff denied ear pain to her providers in 2018 and 2019 (AR 442, 528). These examples have little relevance when viewed in the context of other findings at the same visits, and other visits in the same time period. The first example is a January 24, 2018 visit with PA-C Duran. Although Plaintiff denied ear pain, PA-C Duran notes in the same sentence that she complained of constant plugging of her ears and upon examination perforation and scarring were noted. AR 442. Thus, it is not clear what relevance the ear pain denial has from a functional perspective, or in what respect it has to Plaintiff's alleged dizziness.

The other example of ear pain denial is an August 28, 2019, visit with PA-C Duran for a routine physical ("annual wellness exam"), a visit not specifically to address ear symptoms. Granted, PA-C Duran's notes do reflect that Plaintiff denied ear pain. However, those same notes also reflect she denied every symptom in each of the 14 categories under "review of systems," including most notably a denial of decreased hearing. AR 528. The visit notes further identify grossly normal hearing upon examination. AR 528. But the same record paradoxically lists

available as early as 2016, Plaintiff did not engage in such for almost five years. AR 347, 379, 662." The manner in which those two sentences are presented suggests the latter sentence is rooted in the ALJ's decision.

bilateral hearing loss as a diagnostic impression. AR 531. This undermines the evidentiary value of that record as these findings are plainly inconsistent.

Yet another anomaly in that particular record is that the physical examination notes indicated her tympanic membranes were intact, which is implausible given the visit notes throughout the record before and after PAC Duran's August 2019 examination consistently reflected perforation at least on the left (if it was visualized when not being obscured by pussy discharge) until it was surgically closed in August of 2021. *See e.g.*, AR 352 (August 2016, Dr. Singh noting perforation); AR 355 (November 2016, Dr. Hernandez noting perforation); AR 372 (August 2017, Dr. Sing noting perforation); AR 442 (PA-C Fraga noting perforation in January 2018); AR 381 (August 2018); (AR 542, March 2019); AR 566 (March 2020, FNP Bradley noting perforation); AR 573 (April 2021, Dr. Wong noting perforation).

In short, the annual wellness exam with PA-C Duran was not a representative example to cite regarding Plaintiff's ear condition generally, or her dizziness specifically[9] considering: 1) the examination notes seem facially implausible in several respects (grossly normal hearing with intact tympanic membranes, which was never the case during the relevant period) suggesting these were auto-filled findings, default findings, or simply incorrect findings; 2) the visit covered substantial distinct ground unrelated to the ear condition such as annual blood work, urinalysis, diet and exercise education, asthma and obesity (undermining the notion that the ENT findings were the

[9] To the extent the ALJ was implying that the presence or absence of ear pain, or the percentage of tympanic membrane perforation as noted above, correlates with the level of dizziness/vertigo Plaintiff experienced, is a highly speculative layperson opinion. Perhaps the only fact within the common knowledge of a layperson is that dysfunctions of the inner ear may be associated with dizziness/vertigo. It is not apparent what specific findings would objectively corroborate or refute dizziness/vertigo. This does not mean the ALJ must simply accept the allegations as true, but nor can the allegations be hastily dismissed. There are other options and tools at the Commissioner's disposal, such as engaging a consultative examiner who *would* know what objective signs to look for, could opine on the extent to which the existing medical records corroborate Plaintiff's complaints of dizziness, or could identify any functional restrictions that would be appropriate. However, the ALJ simply reciting a series of findings in succession (some malignant, and some benign) is not sufficient. Unlike common findings of normal muscle strength/range/gait involving common orthopedic conditions, here the records have no self-evident functional relevance to a layperson other than perhaps *corroborating* the existence of a condition that a layperson would associate with dizziness.

result of a thorough examination of the ears commensurate with the type of examination that would be conducted at an examination specifically addressing the ear condition); and 3) there is no shortage of other examinations in the record that did specifically address Plaintiff's ear condition.

### vi. <u>Isolated Dizziness Complaints</u>

Sixth, Defendant contends the complaints of dizziness in the medical records were only isolated instances. The ALJ by contrast simply recited those instances of dizziness complaints as quoted above without describing them as isolated instances, or without drawing any connection between those medical records and Plaintiff's testimony. Further, as Defendant acknowledges, there were four such complaints in the record including two in 2019 prior to her surgery, and two in 2021 following her surgery, the earliest of which was March 2019 and the latest of which was September 2021. Resp. at 9 (citing AR 521, 542, 566, 654). These are a relatively representative number of dizziness complaints, particularly against the backdrop of the relevant period being between the October 25, 2018, application date, and the September 29, 2021 ALJ decision date—especially when considering a roughly 6 month period of time at the end of 2020 was already excluded based on performance of SGA.

### vii. <u>A Host of Medical Opinions</u>

Defendant further contends the ALJ's RFC was supported by a "host of medical opinions" as the ALJ described in the quotation above, namely the opinions of the state agency reviewing consultants. Setting aside the previous application not in issue, there was not a host of medical opinions here. There were exactly two: one opinion from the initial determination and one from the reconsideration determination. That is the same <u>minimum</u> number in just about every case.

Although state agency consultants' findings are relevant considerations per the regulations (20 C.F.R. § 404.1513a(b)(1)), they constitute substantial evidence only when supported by

independent clinical findings or other evidence. *Saelee*, 94 F.3d at 522; *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Further, deference to the state agency consultants' findings is somewhat in tension with the concept of *de novo* review by an ALJ, which claimants are statutorily entitled to "based on evidence adduced at the hearing." *See* 42 U.S.C. § 405(b); SSR 83-46c ("the Social Security Act provides each claimant with a right to a de novo hearing."); SSR 77-4 ("The claimant's right to a de novo hearing, if he wishes one, is made clear by the reference in section 205(b) to the claimant's right to a decision based on evidence 'adduced at the hearing.'"). As the Ninth Circuit has stated, de novo review "considers the matter anew, as if no decision had been rendered." *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009).

**viii. <u>4-Hours of Daily Cell Phone Use</u>**

This was noted alongside her subjective complaints of post-surgical dizziness at her 1 month follow up under the section labeled "history of present illness." AR 654. This is information from the claimant's perspective, and is not tantamount to a suggestion by the doctor that cell phone use was contributing to her dizziness, nor is such an inference reasonable. Further, the ALJ recited that statement with no accompanying discussion.

**VI. <u>Conclusion and Remand for Further Proceedings</u>**

In sum, although the ALJ's 2.5 page RFC discussion was long on factual and legal recitation, it was short on analysis. The few analytical components thereof were not persuasive or substantial pieces of evidence in support of the RFC generally, nor were they clear and convincing reasons for rejecting Plaintiff's testimony relating to her dizziness. The objective findings the ALJ recited without analysis were not self-explanatory as to their functional relevance in support of the RFC, nor did they undermine Plaintiff's claims regarding dizziness.

At a minimum, remand is appropriate for a new hearing and a new decision. *See Benecke*

*v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Obtaining additional detail from the claimant as to the nature and extent of her dizziness would be appropriate given the brevity of the questions and answers on that issue. To the extent the ALJ feels the objective medical records do not corroborate the testimony, consultation with an appropriate medical professional would be warranted to opine on the extent to which the record corroborates dizziness, and/or perhaps for the expert to physically examine[10] the claimant in person to determine the presence or absence of objective signs suggestive of dizziness, and to render a corresponding functional opinion.

## VII. Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion. Accordingly, it is ordered that the Commissioner's decision is reversed, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff Evelyn Ramos and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **December 28, 2023**

**/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE

[10] The lone consultative examination was an audiological exam to assess the extent of hearing loss.